[Cite as *In re D.D.*, 2024-Ohio-5858.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| D.D., JR. | : | CASE NO. CA2024-07-095 |
| | : | O P I N I O N<br>12/16/2024 |
| | : | |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2022-0327

Garrett Law Offices, and Dawn S. Garrett, for appellant.

Michael T. Gmoser, Butler County Prosecuting Attorney, and John C. Heinkel, Assistant Prosecuting Attorney, for appellee.

Andrew J. Brenner, Guardian Ad Litem for Mother.

Legal Aid Society of Southwest Ohio, LLC, and Jamie L. Landvatter, Guardian Ad Litem for Child.

Auciello and Evans, LLP, and D. Joseph Auciello, Jr., for Father.

**PIPER, J.**

{¶ 1} Appellant ("Mother") appeals the decision of the Butler County Court of

Common Pleas, Juvenile Division, granting permanent custody of her minor child, D.D.,

Jr., to appellee, Butler County Department of Job and Family Services ("BCDJFS").[1] For the reasons outlined below, we affirm the juvenile court's decision.

**Facts and Procedural History**

{¶ 2} Mother gave birth to D.D., Jr., a boy, on October 9, 2022. Two days after D.D., Jr.'s birth, on October 11, 2022, BCDJFS filed a complaint alleging D.D., Jr. was a dependent child. BCDJFS filed its complaint after receiving a referral noting that Mother had recently been "probated" to a group home due to "significant mental health concerns." This referral included reports that Mother was "very unstable" and "unable to bring a baby into the group home setting." The record indicates that BCDJFS had also met with Mother prior to filing its complaint in order to "discuss relatives as placement options" for D.D., Jr.

{¶ 3} However, as noted by BCDJFS within its complaint, Mother appeared "unstable and erratic" during this meeting. BCDJFS also noted within its complaint that Mother had "threatened" the BCDJFS caseworker who met with her "numerous times," which ultimately resulted in the BCDJFS caseworker being "unable to discuss any arrangements" for D.D., Jr. with Mother. This was in addition to BCDJFS noting within its complaint that Mother had previously lost custody, either legal or permanent, to five other children, one of which occurred in 2015, whereas another two occurred in 2009.

{¶ 4} The juvenile court granted an emergency ex parte order placing D.D., Jr. in the emergency temporary custody of D.D., Jr.'s paternal aunt later that same day, October 11, 2022. The juvenile court also appointed D.D., Jr. with a guardian ad litem. Shortly thereafter, on November 21, 2022, the juvenile court modified its emergency ex parte order granting emergency temporary custody of D.D., Jr. from the child's paternal aunt to

---

1. D.D., Jr.'s father is not a part of this appeal given his convictions for murder and kidnapping, convictions for which D.D., Sr. will remain incarcerated until, at least, the year 2049.

BCDJFS. The following day, November 22, 2022, the juvenile court appointed Mother with her own guardian ad litem.

{¶ 5} On February 10, 2023, the juvenile court adjudicated D.D., Jr. a dependent child and granted temporary custody of D.D., Jr. to BCDJFS. Mother did not attend this hearing. Mother's guardian ad litem, however, did. Approximately eight months later, on November 28, 2023, BCDJFS moved for permanent custody of D.D., Jr. The juvenile court held a review hearing on BCDJFS' motion on December 20, 2023. Mother, acknowledging that she had been served with BCDJFS' permanent custody motion, appeared at this hearing and requested that she be appointed counsel. The juvenile court granted Mother's request and set the matter for a permanent custody hearing on January 26, 2024. The permanent custody hearing was later continued to April 15, 2024.

{¶ 6} During the permanent custody hearing, which was presided over by a juvenile court magistrate, the juvenile court heard testimony and accepted evidence from two witnesses; Mother and the BCDJFS caseworker assigned to D.D., Jr.'s case. As part of her testimony, Mother acknowledged that she had not been involved in D.D., Jr.'s case for nearly a year following D.D., Jr.'s birth. Mother also acknowledged that she had been hospitalized at least nine times since 2021 and had resided in multiple group homes and shelters when not otherwise experiencing periods of homelessness. This was in addition to Mother acknowledging that she had been inconsistent with her mental health treatment following D.D., Jr.'s birth and that, following D.D., Jr.'s birth, her next contact with D.D., Jr. occurred over a year later, on February 27, 2024.

{¶ 7} On April 17, 2024, the magistrate issued its decision granting permanent custody of D.D., Jr. to BCDJFS. In so doing, the magistrate determined that Mother had abandoned D.D., Jr. after having seen the child just nine times since D.D., Jr., was born. On the other hand, the magistrate found D.D., Jr. had been integrated into his foster

family's home, and "has been receiving good care in that home and his needs as well as his special needs have been or will be being met." The magistrate also noted that, if possible, D.D., Jr.'s foster family was interested in adopting D.D., Jr. The magistrate further noted that D.D., Jr.'s guardian ad litem had submitted a report and recommendation "in favor of a grant of permanent custody to the BCDJFS."

{¶ 8} This was in addition to the magistrate finding the grant of permanent custody of D.D., Jr. to BCDJFS was the only way that D.D., Jr. could be provided with a legally secure permanent placement. The magistrate determined this to be the case based upon the following:

> Mother is currently living in a residence that she obtained through the YWCA. She acknowledges that she cannot live at that residence if she has a child in her care. Her sole source of income is SSI and she is paid a little over $900.00 per month. Her mother is her designated payee. She pays 30% of that money to the YWCA for rent. She can live there until September of this year. She has no definitive plans regarding a residence after that.
>
> Mother has a history of mental health issues. She admits only to depression but her records do not support that diagnosis. The records from her treatment provider indicate that she has a significant history of schizophrenia. She admits that she has a probate "manager" and that she i[s] inconsistent regarding her treatment. She admits that she does not participate in any psychotherapy. She avers that she does regularly take injections as part of her treatment (Haldol and Abilify per her records).
>
> Mother admits that she has been hospitalized nine times since 2021. Also during that time period she has lived in a number of group homes, has lived with friends, lived with boyfriends, and has been homeless.
>
> Mother admits that she has to resort to food pantries in order to get enough food and necessities for herself.

The magistrate further determined that Mother had abandoned D.D., Jr. by having failed to visit or have contact with D.D., Jr. for a period of more than 90 days and that Mother had,

- 4 -

"for about a year, decided to not participate at all in the case . . . ."

{¶ 9} On April 24, 2024, Mother filed an objection to the magistrate's decision. To support her objection, Mother argued the magistrate's decision granting permanent custody of D.D., Jr. to BCDJFS was against the manifest weight of the evidence. More specifically, Mother objected to the magistrate finding:

> (1) that Mother had "no definitive plans regarding a residence" after Mother was to move out of the residence that Mother had obtained through the YWCA;
>
> (2) a return of D.D., Jr. to Mother would be contrary to D.D., Jr.'s best interests; and
>
> (3) the granting of permanent custody of D.D., Jr. to BCDJFS was in D.D., Jr.'s best interests.

{¶ 10} On June 26, 2024, the juvenile court held a hearing on Mother's objection to the magistrate's decision, following which the juvenile court overruled Mother's objection, thereby affirming and adopting the magistrate's decision granting permanent custody of D.D., Jr. to BCDJFS in its entirety.

**Mother's Appeal and Two Assignments of Error**

{¶ 11} On July 23, 2024, Mother filed a notice of appeal. Following briefing, on November 26, 2024, this matter was submitted to this court for consideration. Mother's appeal now properly before this court for decision, Mother has raised two assignments of error for review.

{¶ 12} Assignment of Error No. 1:

{¶ 13} THE TRIAL COURT LACKED PERSONAL JURISDICTION OVER MOTHER TO PROCEED WITH THE ADJUDICATION, DISPOSITION AND PERMANENT CUSTODY AND PROCEED IN ERROR WITHOUT BIFURCATION BEING WAIVED.

{¶ 14} In her first assignment of error, Mother makes a series of claims that are

- 5 -

generally not supported by the record. The most significant of those claims, a claim which the record plainly disproves, is Mother's assertion that the initial complaint alleging D.D., Jr. was a dependent child "was served upon mother only by posting." However, even if we were to assume each of Mother's claims set forth within her first assignment of error were borne out by the record, which they are not, Mother never raised any such arguments to the juvenile court below.

{¶ 15} Similar to the Ohio Supreme Court's holding in *In re K.K.*, 2022-Ohio-3888, because Mother never raised any of the issues she now claims stripped the juvenile court of jurisdiction over her person, and is instead raising them for the first time on appeal, the juvenile court's decisions adjudicating D.D., Jr. a dependent child and granting temporary custody of D.D., Jr. to BCDJFS are valid. Mother's challenge to the juvenile court's jurisdiction over her person is either waived (given her subsequent appearance) or barred by the doctrine of res judicata. *See, e.g., id.* at ¶ 10 (holding "that because the mother and the father failed to timely object to the magistrate's decisions and appeal the judgments granting temporary custody of the children to the agency, those judgments are valid, and the current challenge to the juvenile court's jurisdiction is barred by res judicata").

{¶ 16} "Res judicata bars relitigation of a matter that was raised or could have been raised on direct appeal when a final, appealable order was issued in accordance with the law at the time." *Id.*, quoting *State v. Griffin*, 2013-Ohio-5481, ¶ 3. "'[A]n adjudication that a child is neglected or dependent, followed by a disposition awarding temporary custody to a public children services agency pursuant to R.C. 2151.353(A)(2) constitutes a 'final order' for purposes of R.C. 2505.02 and is appealable to the court of appeals pursuant to R.C. 2501.02.'" *Id.* at ¶ 58, quoting *In re Murray*, 52 Ohio St.3d 155, 161 (1990). Accordingly, because Mother's arguments raised herein are either waived or barred by

the doctrine of res judicata, Mother's first assignment of error lacks merit and is overruled.

{¶ 17} Assignment of Error No. 2:

{¶ 18} THE TRIAL COURT'S DECISION TO GRANT THE AGENCY PERMANENT CUSTODY OF THE CHILD IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 19} In her second assignment of error, Mother argues the juvenile court's decision granting permanent custody of D.D., Jr. to BCDJFS was not supported by sufficient evidence and was otherwise against the manifest weight of the evidence. We disagree with both of Mother's claims.

*Sufficiency and Manifest Weight of the Evidence Standards*

{¶ 20} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re D.P.*, 2020-Ohio-6663, ¶ 13 (12th Dist.). "That is to say, the juvenile court's decision to grant permanent custody must be supported by sufficient evidence." *In re P.E.*, 2023-Ohio-2438, ¶ 14 (12th Dist.). Sufficiency of the evidence is a test of adequacy, i.e., the burden of production. *In re J.E.*, 2023-Ohio-3827, ¶ 10 (12th Dist.), citing *In re L.C.*, 2023-Ohio-2989, ¶ 16 (5th Dist.). "'[W]hether the evidence is sufficient to sustain the judgment is a question of law.'" *In re A.V.*, 2024-Ohio-1091, ¶ 31 (12th Dist.), quoting *In re Z.J.*, 2023-Ohio-1347, ¶ 27 (1st Dist.). "Questions of law, even in permanent custody cases, are reviewed by this court de novo." *In re N.G.*, 2024-Ohio-31, ¶ 15 (12th Dist.). "In conducting a de novo review, this court independently reviews the record without giving deference to the juvenile court's decision." *In re A.V.*, citing *In re S.C.R.*, 2018-Ohio-4063, ¶ 13 (12th Dist.). "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the

evidence.'" *In re C.S.*, 2020-Ohio-4414, ¶ 15 (12th Dist.), quoting *In re T.P.*, 2016-Ohio-72, ¶ 19 (12th Dist.).

{¶ 21} Unlike a challenge to the sufficiency of the evidence, "'[m]anifest weight tests the burden of persuasion, not the burden of production.'" *In re N.G.* at ¶ 16, quoting *Magnum Steel & Trading, LLC v. Mink*, 2013-Ohio-2431, ¶ 31 (9th Dist.). In determining whether a juvenile court's permanent custody decision is against the manifest weight of the evidence, this court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.,* 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 2019-Ohio-5367, ¶ 15 (12th Dist.). "We are especially mindful of this in permanent custody cases." *In re M.G.*, 2021-Ohio-1000, ¶ 26 (12th Dist.). This is because, as it is now well established, "the demeanor and attitude of the witnesses may not translate into the record." *C.A. v. H.S.*, 2020-Ohio-4352, ¶ 16 (12th Dist.), citing *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).

*R.C. 2151.414(B)(1) and the Applicable Two-Part Permanent Custody Test*

{¶ 22} The state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met before a natural parent's constitutionally protected liberty interest in the care and custody of his or her children may be terminated. *In re R.K.*, 2021-Ohio-3074, ¶ 14 (12th Dist.), citing *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). In Ohio, it is R.C. 2151.414(B)(1) that sets forth the statutory standard for permanent custody applicable to the case at bar. *In re M.H.*, 2022-Ohio-49,

¶ 30 (12th Dist.). R.C. 2151.414(B)(1) provides a two-part permanent custody test. *See In re A.M.*, 2020-Ohio-5102, ¶ 18. One part of that two-part permanent custody test, the part that is in dispute here, requires the juvenile court to find the grant of permanent custody to be in the children's best interest.[2] *In re D.K.W.*, 2014-Ohio-2896, ¶ 21 (12th Dist.). This is generally done by utilizing the best-interest factors set forth in R.C. 2151.414(D)(1). *In re S.W.*, 2023-Ohio-118, ¶ 19 (12th Dist.). These factors include, but are not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement. R.C. 2151.414(D)(1)(a)-(d). These factors also include the question of whether any of the circumstances listed in R.C. 2151.414(E)(7) to (11) apply. *In re G.A.*, 2023-Ohio-643, ¶ 41 (12th Dist.), citing R.C. 2151.414(D)(1)(e). These circumstances include instances where the parent has abandoned the child. *See* R.C. 2151.414(E)(10).

*Mother's Arguments and Analysis*

**{¶ 23}** Mother argues the juvenile court's decision granting permanent custody of D.D., Jr. to BCDJFS was done in error because she was "not given a reasonable opportunity to reunify" with D.D., Jr. To support this claim, Mother argues that she only had "three months to work her case plan" before the April 15, 2024 hearing on BCDJFS'

---

2. The other part of that two-part test requires the juvenile court to find that any one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re C.B.*, 2015-Ohio-3709, ¶ 10 (12th Dist.). Pursuant to R.C. 2151.414(B)(1)(b), this includes instances where the subject child has been abandoned. Mother does not dispute the juvenile court's decision finding she had abandoned D.D., Jr. Mother instead argues the juvenile court erred by finding BCDJFS had taken reasonable efforts to reunify her with D.D., Jr. However, in cases of abandonment, "the law explicitly relieves children services agencies of the 'reasonable efforts' requirement . . . ." *In re D.D.*, 2024-Ohio-2769, ¶ 19 (12th Dist.). To the extent Mother argues otherwise, such argument lacks merit. Therefore, for purposes of this opinion, we will focus our attention on what is actually in dispute; that being, whether the juvenile court's decision to grant permanent custody of D.D., Jr. to BCDJFS was in D.D., Jr.'s best interest.

motion for permanent custody. Mother argues that this was fundamentally unfair and requires the juvenile court's decision be reversed when considering she "hit the ground running working her case plan after she was served with the permanent custody (sic) and appeared in December." However, just as the juvenile court found, Mother was "largely missing" after giving birth to D.D., Jr. on October 9, 2022, and "during the majority of the time that this matter has been pending." This, as the juvenile court determined, was due to Mother "voluntarily absent[ing] herself from the case for about a year . . . ."

{¶ 24} Specifically, as the juvenile court found, "[t]he evidence clearly supports the conclusion that, in terms of mother, after some initial cooperation, stopped participating in case plan services" until BCDJFS moved for permanent custody of D.D., Jr. on November 28, 2023. Mother claims her lack of participation in the case was due to her failing to receive notice of BCDJFS' initial complaint alleging D.D., Jr. was a dependent child. The record does not support this contention as Mother clearly knew D.D., Jr. had been removed from her care by BCDJFS at the time BCDJFS filed its dependency complaint on October 11, 2022, two days after Mother gave birth to D.D., Jr. This is evidenced by the fact that Mother, on April 27, 2023, contacted BCDJFS requesting a meeting to discuss how she could be reunified with D.D., Jr., a meeting that we note Mother then failed to attend.

{¶ 25} The juvenile court, just like this court on appeal, must act in a manner that places D.D., Jr.'s best interest above all else. *In re W.J.T.*, 2019-Ohio-3051, ¶ 46 (12th Dist.) "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 2018-Ohio-3341, ¶ 60 (12th Dist.), quoting *In re Keaton*, 2004-Ohio-6210, ¶ 61 (4th Dist.). The juvenile court's decision to grant permanent custody in this case does just that. This is because, as the juvenile court found, granting BCDJFS permanent custody of D.D., Jr. was the only way

that D.D., Jr. could be provided with a legally secure permanent placement given Mother's generally untreated mental health issues, lack of suitable housing, and status as an unemployed individual who subsists of limited SSI benefits. In so holding, we note that D.D., Jr.'s life is not an experiment that can be left to chance. *In re R.D.*, 2021-Ohio-3780, ¶ 39 (12th Dist.). "A child's life also is not something the juvenile court should take a gamble on. This holds true no matter how good the odds may seem." *In re M.G.*, 2023-Ohio-1316, ¶ 58 (12th Dist.). To the extent Mother claims otherwise, such argument lacks merit. Therefore, finding no merit to any of the arguments raised by Mother herein, Mother's second assignment of error challenging the sufficiency and manifest weight of the evidence also lacks merit and is overruled.

## Conclusion

{¶ 26} For the reasons outlined above, and finding no merit to either of Mother's two assignments of error, Mother's appeal challenging the juvenile court's decision granting permanent custody of D.D., Jr. to BCDJFS is denied.

{¶ 27} Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.